Filed 12/23/21

CERTIFIED FOR PARTIAL PUBLICATION[*]


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C091176 |
| Plaintiff and Respondent, | (Super. Ct. No. STKCRFECOD20170007609) |
| v. | |
| ROBERT ARTHUR CLARK, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Joaquin County, Xapuri Villapudua, Judge. Affirmed.

Spolin Law, Aaron Spolin and Annette Gifford, Retained Counsel for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Carlos A. Martinez, Supervising Deputy Attorney General, Catherine Tennant Nieto, Deputy Attorney General, for Plaintiff and Respondent.


Defendant Robert Arthur Clark appeals from his conviction for second degree murder and true findings on the associated firearm enhancements. On appeal, he argues

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II of the Factual and Procedural Background and parts I and II of the Discussion.

1

the trial court erred by inquiring into the identity of a holdout juror and subsequently dismissing that juror, as well as by failing to grant his motion for a new trial based on juror misconduct. He also argues the trial court was biased against him, thus violating his right to due process and a fair trial. We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The facts underlying defendant's case are irrelevant to the contentions he raises on appeal. Suffice it to say that defendant, his girlfriend, and his friend used methamphetamine nearly every day. They heard a female acquaintance had been raped and that the female acquaintance was also coming into a large inheritance. Under a misguided attempt to share in her inheritance, defendant, along with his girlfriend and friend, confronted the alleged rapist and defendant shot and killed him. While the victim of the shooting declared, as he was dying, that it was defendant who shot him, and defendant's girlfriend and friend corroborated that declaration through their testimony at trial, other witnesses saw only defendant's friend's truck at the scene of the shooting and not the vehicle defendant occupied or defendant himself.

I

*Facts Pertaining To Alleged Judicial Bias*

Prior to trial, defendant moved to disqualify the judge presiding over the trial because he had learned the judge and prosecutor were currently involved in a student outreach program wherein they visited classrooms together with a defense attorney. They had completed three classroom visits and would complete one more before participating in a moot court together. Thereafter, defendant alleged the judge adopted the prosecutor's juror questionnaire with minor changes without considering defendant's questionnaire. Based on these facts, defendant argued the judge "demonstrated a bias in favor of [the prosecutor] and against defendant and/or defense counsel." (Capitalization and bolding omitted.)

The judge answered defendant's motion, denying the allegations of judicial bias. The judge explained that the prosecutor "was a volunteer attorney for a program [she had] been involved with for many years. The program is called 'First Impressions'. It involves a Judge and a couple of attorneys teaching a fifth-grade class about the Constitution and criminal justice. It entails four visits to the classroom for about 45 minutes each session culminating in a mock trial at the courthouse in [the judge's] courtroom. The children learn about the [F]ifth and [S]ixth Amendments and then play the parts of attorneys and witnesses during the mock trial. [The judge had] participated in this program as an attorney and as a Judge for over 13 years. Th[at] year [wa]s the first time [the prosecutor] participated as a volunteer attorney. [The judge] did not ask him to participate. He had participated in two sessions and [wa]s expected to help with the mock trial which usually lasts two hours. Judges and attorneys [are] encouraged to do community outreach. [The judge was] involved in this program as well as the Connie Callahan Inn of the Court and [she] attend[s] many county bar functions with numerous attorneys including those in the District Attorney's office and the Public Defender's office. As far as [the judge could] recall, the only contact [she had] ever had with [the prosecutor] outside of his appearing before [her wa]s the two school sessions of the program. [¶] [She] normally would not even feel this fact would merit disclosure except that the last school session and the mock trial were scheduled during this case so out of an abundance of caution [she] disclosed the information." Defendant's motion to disqualify the judge was denied.

II

*Facts Pertaining To Alleged Juror Misconduct*

After the presentation of evidence, the jury deliberated for nine days. During that time, the jury sent multiple notes to the trial court. At the beginning of the second day, it asked to view police body camera footage admitted at trial, as well as defendant's and his girlfriend's interrogations. The jury also requested clarification about which phone numbers were associated with defendant's girlfriend as opposed to defendant's friend.

3

Before deliberations on the fourth day, the court and parties spoke with Juror No. 1 about a concern she had voiced to the clerk. Juror No. 1 said the experience of serving as a juror was not what she had expected. "We are not supposed to be pressured by others, right, they are not supposed to be changing our minds, trying to change our minds? [¶] Because -- we can discuss the case, but they are really pressuring some individuals in there to try to change their minds. It's uncomfortable and I'm -- I don't know how long it's going to go on like that, but I just don't feel we should be pressured by others into changing our minds." The court reminded the juror that the instructions encourage jurors not to hesitate to change their minds, but not to do so simply because of how other jurors feel. The court assured Juror No. 1 that deliberations can, at times, be uncomfortable but the jurors should never feel unsafe. Juror No. 1 indicated she was being asked the same question over and over by the same juror, who at one point apologized to her for his behavior. She felt like she could not take it anymore because it felt like that juror was trying to change Juror No. 1's mind. Juror No. 1 assured the court that she did not feel unsafe, only uncomfortable, and that the repetitive nature of the deliberations was wearing on her. Juror No. 1 agreed to continue deliberating and send a note through the bailiff in the event she felt uncomfortable.

When excusing the jury to the jury room after speaking with Juror No. 1, the court reread to it the portions of the jury instructions encouraging jurors to talk with one another, keep an open mind, and treat each other courteously. It did so under the guise that several days had passed since the jurors were together and it thought reinstructing the jurors on this point would be helpful. Less than an hour later, the jury requested a readback of the testimony of a witness who was standing near the victim when the victim was shot. The jury later advised the court that it had reached a verdict on first degree murder but could not agree further. The parties agreed to take the jury's not guilty verdict on first degree murder and send the jury back to further deliberate. The court encouraged the jury to think about helpful topics to explore, whether that be through requesting readings of testimony

4

or arguments of counsel. The jury later sent a note stating that it wanted to hear portions of defendant's friend's and girlfriend's testimony that identified defendant as the shooter, as well as hearing further argument from the parties. The court complied with both of those requests.

The next day, the court addressed a note the jury had sent before leaving the day before. The note provided: "We have continued to discuss the case but unfortunately we have come to an impasse. We feel the discussion has stalled and we are unable to come to a consensus. We plan on coming in to continue deliberating but we seem stalled." Because the jury said it would continue deliberating and did continue deliberating upon returning to court that morning, the trial court and parties agreed to do nothing about the note.

On the seventh day of jury deliberations, Juror No. 7 spoke to the court and parties about concerns he was having with the process. He expressed that there was a single juror who did not seem to be willing to deliberate. Juror No. 7 elaborated that, "we read the rules multiple times, and it seems like they are using -- they are not looking at the evidence and using, 'I don't feel comfortable voting that way just because I'm the deciding vote now. I know I'm the deciding vote.' [¶] They are continuing to use what-if situations. We respond with, 'Okay. Show us the evidence for those what-if situations.' Then they remain silent. [¶] We ask them direct questions. They are silent. When we ask them to argue their side, they are either silent or that person says that they -- 'I said it all yesterday,' or, 'I feel like I've said it multiple times.' [¶] Well, the whole point is to go over this multiple times, and this is my first time doing this, but I feel like we've really broken this down. We have an engineer in there, who has tried to do a rough analyzation [*sic*] of the bullet trajectory." The trial court cut Juror No. 7 off at this point and focused the conversation on the process of the juror's deliberations instead of the contents of those deliberations. Juror No. 7 stated the juror had minimally participated in the early days of deliberations, in fact, "[t]here's [*sic*] a few people who are relatively quiet. When asked

5

direct questions of those people, those people responded with evidence and their thoughts and feelings, and it feels like -- I got upset with the person one day so maybe they are even more withdrawn and then -- that's my fault. I'm not a perfect person because I -- we have rules to follow and it looks like they are not following the rules. It's going beyond evidence of why they are voting the way they are voting." Juror No. 7 identified Juror No. 1 as the juror he had been referencing in his complaints.

After Juror No. 7 went back to continue deliberating, the trial court and the parties discussed his concerns. Defendant believed Juror No. 7's concerns were part of the deliberative process and the jury needed more time to come to a verdict. The prosecution expressed concerns that Juror No. 1 was not participating in the process and unwilling to change her mind because she believed herself to be the deciding vote. The trial court decided to take no further action because it seemed the jury was currently deliberating, it had received no note from the foreperson, and Juror No. 1 was minimally participating in the deliberative process.

Later that afternoon, the court brought the parties back to the courtroom because it had discovered Juror No. 1's name on its Monday "restraining order calendar," as a party requesting a restraining order. The court indicated it had reviewed Juror No. 1's restraining order petition and felt it needed to give both parties a copy of the petition, but would do nothing regarding Juror No. 1 until asked.

The next day court convened, the prosecutor requested Juror No. 1 be removed. He argued that Juror No. 1's petition for a restraining order revealed she had a years-long history of being stalked, harassed, and threatened with death, and that she had also been poisoned. She claimed in the petition that she had made several police reports concerning the conduct. When the prosecutor looked up the police reports referenced in Juror No. 1's petition, he saw that she had made other police reports alleging domestic violence. The prosecutor was concerned because Juror No. 1 had said in her questionnaire that she had

6

never been the victim of a crime and had only reported suspicious activity in her neighborhood to the police.

Juror No. 1 was brought into the courtroom and confronted solely by the court. The court questioned Juror No. 1 about the inconsistencies between her petition for a restraining order and her juror questionnaire, as well as the police reports discovered by the prosecutor. Juror No. 1 said she did not realize her experiences were encompassed by the questions asked in the questionnaire. As far as failing to disclose she was a victim of a crime, she had never proven her allegations, she only made reports. As for failing to disclose she had previously made various police reports, Juror No. 1 asserted she had not been thinking about the prior police reports when filling out the questionnaire, thus just forgot to mention them. The court expressed doubt at Juror No. 1's answers given the seriousness of the conduct alleged in her petition.

After Juror No. 1 left the courtroom, Juror No. 10 came into the courtroom to confess that she had spoken about the case to a friend out of frustration toward the long deliberation process and the toll it was taking on her professional and personal life. Juror No. 10 told her friend about the holdout juror and revealed the holdout juror's name to the friend. Somehow Juror No. 10's complaints to her friend made the rounds in the community and Juror No. 1, whom Juror No. 10 identified as the holdout juror, heard about them. Juror No. 10 apologized to the court and accepted full responsibility and the consequences. Juror No. 10 told the court she had known Juror No. 1 professionally years ago but had not seen her in years. She said they currently worked in the same school district but not the same school. They did not socialize. On the Friday before, Juror No. 1 told Juror No. 10 she had heard about Juror No. 10's complaints.

Defendant moved for a mistrial or alternatively to remove Juror No. 1 if the court was inclined to remove Juror No. 10. The prosecutor agreed with the latter suggestion. The court excused both jurors for misconduct, explaining that Juror No. 1 "seemed illusive" and her explanations were insufficient, and that Juror No. 10 violated a rule told

7

to her every day of jury service. Two alternate jurors were empaneled. Three hours later, the jury informed the court that it had reached a verdict. The jury found defendant guilty of second degree murder and found true that he personally used a firearm causing death and during the commission of a felony.

Defendant later filed a motion for a new trial arguing Juror No. 1 should not have been removed from service and that both juror and judicial misconduct had occurred. Defendant attached a declaration from Juror No. 1, in which Juror No. 1 declared that she remained undecided regarding defendant's guilt throughout deliberations. On the first day of deliberations four jurors were undecided and believed some of the witnesses were not credible because of their drug use. In response, "[a] couple of jurors said they had used methamphetamine and that if you are on methamphetamine's/drugs [*sic*] your memory is very good. Some of the witnesses said that they couldn't remember certain things because they have been on methamphetamine for so long. [¶] . . . The juror said he had used methamphetamine/drugs and remembered things much more clearly when he was using drugs more than a normal person can remember. . . . [¶] . . . The four (4) jurors that [*sic*] continued to vote undecided said during deliberations that the jurors couldn't trust the memories of the people that [*sic*] used methamphetamine." As deliberations continued, things got intense with three jurors "picking" on the four undecided jurors, trying to get them to change their votes to guilty. Juror No. 2 said she could not stand the stress anymore and changed her vote to guilty.

Juror No. 1 also declared that "[t]here was one (1) male juror that [*sic*] said he was an engineer and said that he felt [defendant] was the shooter because of his height. The jury discussed the height of the shooter; that it had to be someone tall. The Engineer discussed the height and angle of the shot; he was doing a lot of math up on the wall. I felt the jury was lost with the engineer's math. The engineer said he knew math; he was always trying to figure things out, with his math problems." The jurors also did math to figure out how far away cars were parked from where the victim was shot.

Defendant also attached a declaration from Juror No. 2. Juror No. 2 declared she "felt the jurors were verbally attacking [Juror No. 1] because they went through the evidence and she continued to vote, **Not Guilty.**" Juror No. 2 also felt "intimidated" by three male jurors, including the foreperson and the engineer. She believed they were intimidating her because they wanted a unanimous verdict of guilty. Juror No. 2 did not believe defendant "received a fair trial because I consider someone else may have committed the crime, but the Judge said we were to consider the evidence only." Juror No. 2 recalled " the Engineer saying something about the height of the shooter. The Engineer acted out the crime, and that it had to be [defendant], because the shooter had to be tall."

Finally, defendant attached a declaration from his attorney. Defendant's attorney declared he had attempted to recuse the judge presiding over defendant's trial because he felt the judge was biased toward the prosecutor and against him. After the proceedings had been suspended to hear the recusal motion, the judge's clerk inquired of defense counsel's availability for trial but then the judge did not pick those dates and instead chose the dates selected by the prosecutor without discussion. The court also denied defense counsel's motion to continue to investigate favorable evidence recently disclosed to the defense. The judge also made numerous adverse rulings related to dismissing Juror No. 1.

Sometime after trial and before the hearing on defendant's motion for a new trial, defendant and Juror No. 1 got married. The prosecution introduced jail calls between defendant and Juror No. 1 at the hearing on defendant's motion for a new trial, which he argued demonstrated any error in dismissing Juror No. 1 was harmless given the rampant misconduct the jail calls revealed on Juror No. 1's behalf. This misconduct included Juror No. 1's romantic feelings for defendant during trial, her communications with defendant's brother during trial and his family after trial, and Juror No. 1 taking a photo of defendant during trial. Despite Juror No. 1's obvious bias, defendant argued that the acts of misconduct he cited in his motion were all substantiated by either Juror No. 2's declaration or the conversation the court had with Juror No. 7. Specifically, that a juror engineer tried

9

to convince the jury that defendant was the shooter because of defendant's height based on his own calculations and that a methamphetamine-using juror commented his memory was better when he used drugs.

The court denied defendant's motion for a new trial, finding Juror No. 1 was properly discharged, and that no juror or court misconduct occurred. The court sentenced defendant to at total term of 40 years to life, comprising of 15 years to life for the second degree murder conviction, and 25 years to life for the firearm-use enhancement causing death. The court imposed a 10-year term on the remaining firearm-use enhancement, but stayed the term pursuant to Penal Code[1] section 654.

Defendant appeals.

DISCUSSION

I

*It Was Not Error To Discharge Juror No. 1*

Relying on *Barber*, defendant contends the court erred by eliciting from Juror No. 7 that Juror No. 1 was a holdout juror because it allowed the prosecutor to engage in a "fishing expedition" designed to discover misconduct that could be used to discharge Juror No. 1 from jury service. (*People v. Barber* (2002) 102 Cal.App.4th 145.) Defendant also argues the court's reasons for discharging Juror No. 1 were insufficient. We disagree as to both arguments.

Defendant argues "the prosecutor's fishing expedition to determine if there was any way to dismiss Juror No. 1 was directly related to the trial court's revelation of Juror No. 1's identity as the lone holdout juror." Defendant argues his case is like *Barber* and the court's and prosecution's investigation into Juror No. 1's misconduct rendered his trial fundamentally unfair. We disagree; *Barber* is distinguishable.

---

[1] Further section references are to the Penal Code unless otherwise indicated.

10

In *Barber*, the foreperson informed the court that it was " 'hopelessly deadlocked' " at 11 to 1 after having deliberated in good faith. (*People v. Barber*, *supra*, 102 Cal.App.4th at p. 148.) The defense objected to the court questioning the jury. Nevertheless, the court asked the jurors whether everyone had deliberated in good faith. Seven jurors said they had; five jurors "answered no." The court then questioned the five jurors who "answered no"; they alleged that a single other juror was refusing to deliberate and identified the juror. The court then permitted both counsel to question the jurors about the alleged misconduct. (*Ibid*.) The prosecutor then "extensively examine[d]" the purportedly offending juror. (*Id*. at p. 151.) The appellate court held that "the trial court erred by asking questions of the jurors that revealed the identity of the lone holdout juror, by allowing the prosecution to examine the holdout juror, and by allowing testimony from only those jurors who claimed the holdout juror was not deliberating in good faith." (*Id*. at p. 147.)

Unlike the one-sided inquiry conducted in *Barber*, Juror No. 1's misconduct was not discovered through such tactics. Indeed, when the court was informed Juror No. 1 was struggling during deliberations, the trial court and counsel agreed the jury should continue to deliberate until the foreperson informed them of a deadlocked jury. Unlike *Barber*, Juror No. 1's alleged misconduct was not discovered through the questioning of other jurors or the questioning of Juror No. 1, but, as the trial court aptly put it, "a fluke situation." But once the trial court discovered Juror No. 1 had been untruthful during voir dire, it was required to hold a hearing into the matter. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1348 ["A hearing is required only where the court possesses information which, if proved to be true, would constitute 'good cause' to doubt a juror's ability to perform his or her duties and would justify his or her removal from the case"].)

The trial court did not hold a hearing into Juror No 1's potential misconduct until the next court day. Before then, the prosecutor investigated and discovered Juror No. 1 was untruthful when stating on the questionnaire that she never made a police report

outside of a neighborhood disturbance, not just because of the assertions contained in her petition for a restraining order, but also because of police reports indicating she had called the police to report she had been the victim of domestic violence. At the subsequent hearing, the trial court confronted Juror No. 1 about all the discovered inconsistencies but was mostly concerned with those related to the restraining order petition. In the court's mind, it was not credible that Juror No. 1 would not have thought about the criminal conduct she alleged in her restraining order petition when asked whether she was the victim of a crime. The allegations in the petition were serious and had occurred recently, and the matter was pending in the same court where Juror No. 1 was serving as a juror. Further, Juror No. 1 exhibited odd behavior during questioning, leading the court to believe she was being illusive. Neither counsel was permitted to question Juror No. 1, and no other juror was questioned on the topic. The questioning was limited to Juror No. 1's answers on her questionnaire and did not go into other grounds for disqualification. Given the court's limited inquiry of Juror No. 1 following its discovery of possible juror misconduct related to that juror, defendant's case is not like the one considered in *Barber*.

Additionally, the reasons provided by the court for discharging Juror No. 1 were sufficient. Section 1089 authorizes a trial court to discharge a juror and substitute an alternate if "good cause" is shown that the juror is "unable to perform his or her duty . . . ." A juror may be excused for actual bias, which is "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (Code Civ. Proc., § 225, subd. (b)(1)(C); *People v. Ledesma* (2006) 39 Cal.4th 641, 670.) While we review a trial court's determination to discharge a juror for an abuse of discretion, "a juror's inability to perform as a juror must be shown as a 'demonstrable reality' [citation], which requires a 'stronger evidentiary showing than mere substantial evidence . . . .' " (*People v. Wilson* (2008) 44 Cal.4th 758, 821.)

12

Here, the trial court found Juror No. 1 was not credible in her demeanor or in her answers to the court's questions.  We must defer to this credibility finding.  (*People v. Lopez* (1993) 13 Cal.App.4th 1840, 1844.)  Juror No. 1's untruthfulness pertained to her status as a crime victim and that she had previously reported being the victim of a crime to police.  Nothing came of Juror No. 1's reports, potentially leaving her with a distrust and bias toward law enforcement or belief in vigilante justice.  Given Juror No. 1's lack of candor and the trial court's credibility finding, we conclude the record shows as a demonstrable reality that good cause existed to disqualify Juror No. 1.

II

*The Court Did Not Abuse Its Discretion By Denying*

*Defendant's Motion For A New Trial*

Defendant contends the trial court erred by denying his motion for a new trial because the jury committed misconduct by relying on facts not in evidence, i.e., the juror engineer's math equations and conclusions that defendant must be the shooter given his height and the methamphetamine-using juror's statements that a person under the influence of methamphetamine has a good memory.  We disagree.

A motion for a new trial may be granted on the ground of juror misconduct. (§ 1181, cases 2, 3, 4.)  " ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' "  (*People v. Cox* (1991) 53 Cal.3d 618, 694.)  Once misconduct is shown, the misconduct "raises a presumption of prejudice '[which] the prosecution must rebut . . . by demonstrating "there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment." ' "  (*In re Boyette* (2013) 56 Cal.4th 866, 892.)  An appellate court reviews independently the determination of prejudice arising from juror misconduct, but the trial court's credibility determinations and factual findings are reviewed under the more deferential substantial evidence standard.  (*People v. Nesler* (1997) 16 Cal.4th 561, 582 & fn. 5.)

13

Defendant's contentions of juror misconduct raise the question of where to draw the line between permissible considerations of juror experiences and impermissible consideration of juror expertise. Our Supreme Court has held that "[i]t is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial." (*In re Malone* (1996) 12 Cal.4th 935, 963.) A juror "should not discuss an opinion explicitly based on specialized information obtained from outside sources," as such an "injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct." (*Ibid*.) Nevertheless, "if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in evaluating and interpreting that evidence." (*People v. Steele* (2002) 27 Cal.4th 1230, 1266.) "Moreover, during the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence. We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations." (*Ibid*.)

As our Supreme Court has stated, "[a] fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' " which would be "misconduct." (*People v. Steele*, *supra*, 27 Cal.4th at p. 1266.) We find the cases defendant cites as particularly helpful for delineating where that line should be drawn and on what side this case falls.

In *Stankewitz*, the defendant was on trial for robbery based on an incident in which he demanded to see two individuals' wallets at gunpoint but returned the wallets without removing anything. (*In re Stankewitz* (1985) 40 Cal.3d 391, 396.) The jury was instructed on the elements of robbery, "including the requirement that the perpetrator have a specific intent to *permanently* deprive the victim of his property." (*Id.* at p. 399.) In a petition for habeas corpus, the defendant alleged juror misconduct based on declarations from two

14

jurors stating a fellow juror had "advised the other jurors that he had been a police officer for over 20 years; that as a police officer he knew the law; that the law provides a robbery takes place as soon as a person forcibly takes personal property from another person, whether or not he intends to keep it . . . ." (*Id*. at p. 396.) Our Supreme Court held the juror had "committed overt misconduct" by " 'consult[ing]' his own outside experience as a police officer on a question of law. . . . Had he merely kept his erroneous advice to himself, his conduct might be the type of subjective reasoning that is immaterial for purposes of impeaching a verdict. But he did not keep his erroneous advice to himself; rather, vouching for its correctness on the strength of his long service as a police officer . . . ." (*Id.* at pp. 399-400.)

Conversely, in *Lucas*, the defendant claimed he killed his neighbors while he was unconscious after injecting himself with large quantities of methamphetamine, cocaine, and heroin. (*In re Lucas* (2004) 33 Cal.4th 682, 691.) A referee appointed to conduct an evidentiary hearing and make findings concerning the defendant's claim of juror misconduct determined that a juror had concluded the defendant had lied about how much drugs he had taken or the effect those drugs had on the defendant; the juror shared his opinion with the other jurors; and the juror's opinion was based on the juror's personal experience with controlled substances and not on evidence received at the trial. (*Id*. at pp. 693, 694-695.) Our Supreme Court rejected the claim of juror misconduct. (*Id*. at p. 697.) It noted that the juror did not hold himself out as an expert in a technical matter on the basis of his education or occupation, but merely related his personal experience about a matter that was of fairly common knowledge, as it related to the evidence and the inferences the defendant wanted the jury to draw from the evidence. (*Ibid*.) The Court also considered the fact that the juror disclosed that he was a former addict and alcoholic during voir dire. (*Ibid*.) Our Supreme Court further held it was not substantially likely that any juror was biased by the challenged juror's comments, considering the general awareness people had of the effects of controlled substances, the mild and brief nature of

the comments, the tentative spirit in which they were offered, and the lack of insistence that the comments should convince the other jurors to reject the defense. (*Ibid*.)

Here, the methamphetamine-using juror shared a personal experience relevant to the credibility of the witnesses at issue, much like the juror in *Lucas*. (*In re Lucas*, *supra*, 33 Cal.4th at p. 697.) Indeed, as Juror No. 1 provided in her declarations, several jurors shared their experiences related to memory and drug use, as did several witnesses. No juror relied on a purported expertise or education, and simply relayed personal experiences.

On the other hand, the comments made by Juror No. 7 and the assertions contained in the declarations show the opinion given by the juror engineer fell on the impermissible side of the line. Like the juror in *Stankewitz*, the juror engineer relied on his expertise as an engineer to put forth the opinion that the bullet trajectory supported a conclusion that a tall person shot the victim. (*In re Stankewitz*, *supra*, 40 Cal.3d at pp. 399-400.) The juror engineer relied on math equations to prove to the rest of the jury his theory was correct. The problem with the juror engineer's opinion is that no evidence was introduced at trial pertaining to the bullet's trajectory. The prosecution did not seek conviction on this theory, nor did defendant pursue acquittal on a theory involving bullet trajectory. The juror engineer was not interpreting evidence when sharing his opinion with the rest of the jury, instead he was creating additional evidence for the jury to consider. This was improper.

Even so, there was no substantial likelihood that any juror was improperly influenced to defendant's detriment. Juror No. 1 declared the jurors were all lost in the engineer juror's math. Moreover, Juror No. 1 also declared jurors changed their votes to guilty, not because of the juror engineer's purported expertise and opinion, but because they felt pressured by other jurors to do so.[2] Thus, there is no causal connection between

---

[2] Defendant does not raise this as a ground for reversal.

16

the juror engineer's statements and any juror's vote.  Accordingly, the trial court did not err by denying defendant's motion for a new trial.

III

*The Trial Judge Did Not Violate Defendant's Due Process Right*

Defendant contends the trial judge violated his right to due process under the Fourteenth Amendment to the United States Constitution because she favored the prosecutor, with whom she participated in a civics education program.  We disagree, noting our decision addresses only the federal due process question raised by defendant.[3]

"According to the high court, the protection afforded a litigant under the due process clause in the realm of judicial disqualification extends beyond the narrow common law concern of a direct, personal, and substantial pecuniary interest in a case to 'a more general concept of interests that tempt adjudicators to disregard neutrality.'  (*Caperton* [*v. A. T. Massey Coal Co.* (2009) 556 U.S. 868, 878 (*Caperton*)].)  Where such interests are present, a showing of actual bias is not required.  'The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is "likely" to be neutral, or whether there is an unconstitutional "potential for bias." '  (*Id.* at p. [881].)  Moreover, the court has said that ' "what degree or kind of interest is sufficient to disqualify a judge from sitting 'cannot be defined with precision.' " '  (*Id.* at p. [879].)

---

[3]    Whether the judge violated an ethical standard or was disqualified under Code of Civil Procedure section 170.1 is a complex question subject to a different standard than that presented in this appeal.  (Code of Civ. Proc., § 170.1, subd. (a); Cal. Code Jud. Ethics, canons 2B(1), 3B(7) [pertaining to a judge's duty to make reasonable efforts to avoid ex parte communications], 4B(3) [pertaining to a judge's service on a board of civic or other organization; Advisory Com. com., foll. canons 4A & 4B "[c]omplete separation of a judge from extrajudicial activities is neither possible nor wise; a judge should not become isolated from the community in which he or she [or they] lives"]; Cal. Supreme Court Com. on Jud. Ethics Opn. (2013) Disqualification Based on Judicial Campaign Contributions from a "Lawyer in the Proceeding," formal opn. No. 2013-003, p. 4.)  We render no opinion in this regard.

Nonetheless, the court has also made it abundantly clear that the due process clause should not be routinely invoked as a ground for judicial disqualification. Rather, it is the exceptional case presenting extreme facts where a due process violation will be found. (556 U. S. at [pp. 887-888].) Less extreme cases -- including those that involve the mere appearance, but not the probability, of bias -- should be resolved under more expansive disqualification statutes and codes of judicial conduct. (*Ibid*.)" (*People v. Freeman* (2010) 47 Cal.4th 993, 1005 (*Freeman*).)

The extreme circumstances at issue in *Caperton* illustrate the heightened due process standard. There, the Supreme Court of Appeals of West Virginia reversed a trial court judgment entered following a jury verdict of $50 million. Five justices heard the case, and the vote to reverse was three to two. One of the justices in the majority denied a recusal motion. The basis for the motion was that the justice had received campaign contributions in an extraordinary amount ($3 million) from, and through the efforts of, the board chairman and principal officer of the corporation found liable for the damages. (*Caperton*, *supra*, 556 U.S. at pp. 872-873 [173 L.Ed.2d at pp. 1214-1215].)

The Supreme Court explained that the case before it was " 'exceptional' " and concluded that " 'there is a serious risk of actual bias -- based on objective and reasonable perceptions -- when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent.' (*Caperton*, *supra*, 556 U.S. at [p. 884].)" (*Freeman*, *supra*, 47 Cal.4th at p. 1004.) The Supreme Court focused on the relative size of the contribution -- it was larger than the amount spent by all other contributors and 300 percent greater than that spent by the campaign committee -- and the " 'temporal relationship between the campaign contributions, the justice's election, and the pendency of the case . . . . It was reasonably foreseeable, when the campaign contributions were made, that the pending case would be before the newly elected justice.' (*Id*. at pp. [885-886].)" (*Freeman*, at p. 1004)

18

Our Supreme Court has applied *Caperton* in a handful of cases, three of which offer helpful guidance in the present case. First, in *Freeman*, the defendant was tried before a judge who had previously disqualified himself based on an appearance of bias -- his friendship with a judge whom the defendant was rumored to have been stalking -- but who later was reassigned to the defendant's case after the stalking rumors proved unfounded. On appeal, the defendant argued that her trial before the previously disqualified judge violated her due process right to an impartial judge. Our Supreme Court rejected the claim, explaining that Code of Civil Procedure section 170.1, subdivision (a)(6)(A)(iii) provides "an explicit ground for judicial disqualification" based on "a public perception of partiality, that is, the appearance of bias." (*Freeman*, *supra*, 47 Cal.4th at pp. 996-999, 1001.) And, our Supreme Court noted, *Caperton* clarified that the due process clause operates more narrowly: "[W]hile a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient. Instead, based on an objective assessment of the circumstances in the particular case, there must exist ' "the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable." ' ([*Caperton*, *supra*,] 556 U.S. at p. [877].)" (*Freeman*, at p. 996.)

Turning to the facts of *Freeman*, our Supreme Court concluded that the defendant's case did not implicate any of the concerns -- such as "pecuniary interest, enmeshment in contempt proceedings, or the amount and timing of campaign contributions" -- found in the United States Supreme Court's decisions holding that due process required judicial disqualification. (*Freeman*, *supra*, 47 Cal.4th at p. 1006.) Further, the circumstances were not so extreme as to warrant a finding of a probability of actual bias. "At most, [the judge's] decision to accept reassignment of defendant's case may have violated the judicial disqualification statutes that limit the actions that may be taken by a disqualified judge. [Citations.] But, without more, this does not constitute the kind of showing that would justify a finding that defendant's due process rights were violated." (*Freeman*, at p. 1006.)

19

Later that year, our Supreme Court decided *People v. Cowan* (2010) 50 Cal.4th 401, and elaborated on the showing required to establish judicial bias of constitutional dimension. "As the high court explained in *Caperton*, a constitutionally intolerable probability of actual bias exists only when the circumstances ' "would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused." ' [Citation.] This inquiry is an objective one, based on whether ' "under a realistic appraisal of psychological tendencies and human weakness," the interest "poses such a risk of actual bias and prejudgment that the practice must be forbidden . . . ." ' " (*Cowen*, at p. 457.)

Most recently, in *Nieves*, our high court considered whether multiple instances of judicial misconduct established judicial bias sufficient to violate the due process clause. There, the court determined that the trial judge engaged in judicial misconduct by making "inappropriately disparaging and sarcastic remarks to defense counsel, impugning his performance, chastising him for improper behavior, and sanctioning and citing him for contempt in front of the jury. [¶] The trial judge also directed improper comments and questions to witnesses, openly doubting the credibility of one defense expert by asking argumentative and hostile questions and remarking on the possibility that another defense expert 'just doesn't know what he's talking about.' When confronted with a juror who had been exposed to extrajudicial information that was likely to enhance the credibility of a prosecution expert, the trial court revealed the information to the entire jury. In the penalty phase, the trial judge needlessly reprimanded and belittled a lay witness who testified for the defense." (*People v. Nieves* (2021) 11 Cal.5th 404, 477.)

Notwithstanding the trial judge's misconduct, our Supreme Court rejected the defendant's argument that the misconduct violated his due process rights. Our Supreme Court summarized its prior cases in this area, noting that the " 'controlling principle' of unconstitutional bias rests on a 'general concept of interests' that may prevent adjudicators

20

from remaining ' "disinterested in the conviction or acquittal of those accused." '
[Citations.] Though traditionally focused on pecuniary influences (*Freeman*, [*supra*, 47
Cal.4th] at pp. 1001-1002), the high court has explained that there may be a disqualifying
interest in the outcome of criminal proceedings that 'rests on the relationship between the
judge and the defendant.' (*Caperton*, [*supra*, 556 U.S.] at p. 881.) A judge would be
unlikely to remain neutral, for example, when presiding over criminal contempt
proceedings involving a defendant with whom the judge had a ' "running, bitter
controversy." ' (*Ibid*.) Appellate opinions we cited in *Freeman* provide additional
examples of bias that reflect a judge's relationship to the parties before it (*Freeman*, at
p. 1006, fn. 4): in those cases, trial judges made inappropriate comments about women, in
cases decided against women [citations], about lawyers, when the defendant was an
attorney [citation], and about noncitizens, when one party was a foreign national
[citation]." (*People v. Nieves*, *supra*, 11 Cal.5th at p. 499.)

Applying the principles just summarized, we consider whether the trial judge's
relationship with the prosecutor, which was based on a single instance of co-participation
in a civics education program consisting of four classroom visits and a two-hour moot
court session, reflects a constitutionally intolerable possibility that the judge harbored an
interest in the outcome of defendant's trial. We conclude that it does not. The judge did
not have a personal relationship with the prosecutor outside of court or the legal-related
civics education program. Indeed, the judge did not socialize with the prosecutor on a
different level than she socialized with other attorneys in the legal community, which was
generally confined to bar events and other legal-based organizations. The fact that some of
the judge's and prosecutor's interactions occurred during defendant's trial does not change
this result. There was limited contact outside the courtroom and no evidence any of it was
related to defendant's case; all evidence was to the contrary. Isolated opportunities to
communicate about unrelated events, even if occurring during defendant's trial, do not in
and of themselves demonstrate a constitutionally problematic interest. Defendant's claim

21

of judicial bias of constitutional magnitude is without merit; he cannot point to an interest held by the trial judge that caused her to disregard judicial neutrality. (*People v. Armstrong* (2019) 6 Cal.5th 735, 798 ["a judge's 'rulings against a party -- even when erroneous -- do not establish a charge of judicial bias, especially when they are subject to review' "].)

DISPOSITION

The judgment is affirmed.


/s/
Robie, J.



We concur:


/s/
Blease, Acting P. J.



/s/
Duarte, J.

22